1

Confidential **Memorandum**

**Date:** May 5, 2025

**Subject:** Akron City School District - Investigation Report

**From:** Tracy Agyemang Vroom, Esq.

**Title:** Investigator

**To:** Angela Carter, Chief of Staff
Tod Wammes, Labor Relations Manager

## I.    Introduction:

This investigation was initiated following allegations by Darian Johnson that William White engaged in activity that created a hostile work environment and a breach of confidentiality. Mr. Johnson alleges unauthorized disclosure of his social security number, home address, and vehicle information (hereafter "Personal Identifiable Information" or "PII") by electronic dissemination and by distributing physical copies of his job application to multiple unauthorized staff and with third parties not employed with Akron Public Schools ("APS"). If corroborated by facts, Mr. Johnson's allegations would amount to a breach of several APS policies and the Ohio Privacy Act.

APS requested an impartial and prompt investigation into the following allegations:

A. William White Allegedly Breached Aps's Information Security Policy and the Privacy Act in Regards to Darian Johnson.

B. William White Allegedly Breached APS's Information Security Policy and the Privacy Act in Regards to Roland Mclane.

C. Darian Johnson Was Allegedly Subject to a Hostile Work Environment.

D. Roland Mclane Was Allegedly Subject to a Hostile Work Environment.

E. Adam William Allegedly Engaged in Retaliation Against Darian Johnson.

## II.    Investigator's Summary of Conclusions:

- Did William White Breach APS's Information Security Policy and the Privacy Act in regards to Darian Johnson?
  - Inconclusive.

- Did William White Breach APS's Information Security Policy and the Privacy Act: in regards to Roland McClane?
  - Inconclusive.

- Did Any APS Employee Subject Darian Johnson to a Hostile Work Environment?
  - Yes.

- Did Any APS Employee Subject Roland McLane to a Hostile Work Environment?
  - No.

- Did Adam William Retaliate Against Darian Johnson?
  - No.

## III.   Parties:

A.  Mr. Darian Johnson
B.  Mr. Roland Mclane
C.  Mr. William White
D.  Mr. Adam White

## IV.    Methodology + Investigative Process:

**1.  <u>The Investigator separately interviewed:</u>**

- Mr. Darian Johnson - Supervisor Custodial Services
- Mr. William White - Supervisor Custodial Services
- Mr. Roland McClane - Grounds Main Helper
- Mr. Steven Keenan - Director of Facilities Services
- Mr. William Sheppard - Assistant Custodian Class III (Head Custodian) Firestone High CLC and Litchfield CLC
- Mr. Brett Dale - Custodian Class III (Head Custodian) Garfield CLC

- Mr. Adam White - Custodian Class III (Head Custodian) Ellet CLC; SEIU Local 1 - Representative

2. **The Investigator also reviewed documents and emails including:**

   a. **Emails:**

- August 15, 2024: 10:45AM - William White to Steve Keenan; cc: Debra Foulk
  - Cassandra Smith v. Darian Johnson, Complaint for Damages and Reinstatement, CV-2023-04-1106

- August 23, 2024: 1:53PM - Sean Roth to William White
  - August 23, 2024: 1:59PM - William White to Steve Keenan
  - August 23, 2024: 2:00PM - William White to Sean Roth
  - August 26, 2024: 7:13AM - William White to Thomas Matt Frame

- August 24, 2024: 11:00AM - Rob Fincher to William White "Will White, I was informed that you wanted statements if we had any negative interactions with DJ. Here is mine."
  - August 23, 2024: 11:39am - William White to Steve Keenan
  - August 23, 2024: 11:48am - William White to Rob Fincher
  - August 23, 2024: 12:13pm - Rob Fincher to William White
  - August 23, 2024: 1:19pm - Steve Keenan to William White

- August 25, 2024: 5:12PM - John Ferguson to William White
  - August 26, 2024: 11:17AM - William White to Steve Keenan
  - August 26, 2024: 11:17AM - William White to Thomas Matt Frame
  - August 26, 2024: 1:18PM - William White to Thomas Matt Frame
  - August 26, 2024: 2:51PM - William White to John Ferguson

- February, 11, 2025: 4:28pm - "Formal Complaint and Serious Breach of Confidentiality and Hostile Work Environment" - Darian Johnson to Angela Carter, Michael Robinson
  - February 23, 2025: 10:05AM - Darian Johnson to Angela Carter, Robyn Moore, Tod Wammes; cc: Michael Robinson
  - March 3, 2025: 10:16PM - William White to Angela Carter
  - March 3, 2025: 4:31PM - Angela Carter to William White
  - March 4, 2025: 6:56PM - William White to Angela Carter; cc: Tod Wammes
  - March 4, 2025: 9:14AM - Angela Carter to William White
  - March 5, 2025: 1:51PM - Angela Carter to Todd Wammes, Robyn Moore
  - March 5, 2025: 12:13PM - Roland Mclane to Angela Carter
  - February 21, 2025: 5:18pm - Angela Carter to Robyn Moore, Tod Wammes

- February, 23, 2025: 10:05am - "Request for Special Investigation" - Darian Johnson to Angela Carter, Tod Wammes, Robyn Moore

- March 3, 2025: 4:31pm - "Application Sharing" - Angela Carter to William White
  - March 3, 2025: 10:16pm - William White to Angela Carter
  - March 4, 2025: 9:14am - Angela Carter to William White
  - March 4, 2025: 6:56pm - William White to Angela Carter, Tod Wammes

- March 5, 2025: 12:13PM - "Breach of Confidentiality and Privacy" - Roland Mclane to Angela Carter
  - March 5, 2025: 1:51PM - Angela Carter to Tod Wammes, Robyn Moore

- April 15, 2025: 8:47PM - Darian Johnson to Angela Carter

- April 15, 2025: 2:54PM - "Training Notice" -  Matthew Buser to Adam White: cc: Darian Johnson, Thomas Frederick, William Sheppard, Steven Keenan, William White, Steven Shiplett, Angela Carter, Tod Wammes, Omar Jimenez, Camilo Villa
  - April 16, 2025: 9:59 AM - Adam White
  - April 16, 2025: 10:34AM - Matthew Buser

- April 17, 2025: 10:02AM - Darian Johnson to Joshua Lipply; cc: Matthew Buser, William Sheppard, George Reese, Adam White, Brett Dale
  - April 17, 2025: 9:55AM - Joshua Lipply
  - April 17, 2025: 9:46AM - Darian Johnson
  - April 17, 2025: 8:28AM - Matthew Buser
  - April 16, 2025: 7:11PM - William Sheppard
  - April 16, 2025: 5:02PM - George Reese
  - April 16, 2025: 4:16PM - Matthew Buser
  - April 16, 2025: 4:16PM - Darian Johnson
  - April 16, 2025: 3:19PM - Adam White
  - April 16, 2025: 3:02PM - Darian Johnson
  - April 16, 2025: 2:51PM - Adam White
  - April 16, 2025: 2:21PM - Darian Johnson
  - April 16, 2025: 2:19PM - Joshua Lipply

### b. **Other documents:**

- Adam White screen shot of only incoming calls[1] from April 4, 2025 - April 15, 2025

### 3. **Methodology:**

---

[1] Notably, Adam White did not provide the full scope of phone records requested during the investigation. Specifically, he submitted a log of incoming calls only, omitting records of outgoing calls. While this limited the completeness of the documentation, it did not materially affect the conclusions reached regarding the allegations against him.

5

Interviews were conducted via video conference. The undersigned Investigator relied upon documents and records provided by the School District, parties, and witnesses; including emails. Background and facts contained in witness statements were then cross-checked against written evidence and statements of other witnesses to establish credibility.

## V.  Applicable Laws and Policies:

- **Unauthorized Disclosure of PII**

    - Akron Public Schools, Policy Manual - 8305 Information Security
      Data/Information collected by the District shall be classified as Confidential, Controlled, or Published.  Data/Information will be considered Controlled until identified otherwise.

      Protecting District Information Resources (as defined in Bylaw 0100) is of paramount importance.  Information security requires everyone's active participation to keep the District's data/information secure.  This includes Board of Education members, staff members/employees, students, parents, contractors/vendors, and visitors who use District Technology Resources (as defined in Bylaw 0100).

      Individuals who are granted access to data/information collected and retained by the District must follow established procedures so that the data/information is protected and preserved.  Board members, administrators, and all District staff members, as well as contractors, vendors, and their employees, granted access to data/information retained by the District are required to certify annually that they shall comply with the established information security protocols pertaining to District data/information.  Further, all individuals granted access to Confidential Data/Information retained by the District must certify annually that they will comply with the information security protocols pertaining to Confidential Data/Information.  Completing the appropriate section of the Staff Technology Acceptable Use and Safety form (Form 7540.04 F1) shall provide this certification.

      All Board members, staff members/employees, students, contractors/vendors, and visitors who have access to Board-owned or managed data/information must maintain the security of that data/information and the District Technology Resources on which it is stored.

7

## VI.   Analysis and Findings

### A. Darian Johnson's Allegation that William White Breached APS's Information Security Policy and the Ohio Privacy Act

Mr. Johnson alleges that William White disclosed his social security number, home address, and vehicle information (hereafter "Personal Identifiable Information" or "PII") by electronic dissemination and by distributing physical copies of his job application to unauthorized personnel and third parties. If true, such actions would amount to a breach of APS's Information Security Policy and the Ohio Privacy Act. The evidence does not conclusively support the allegation that William White breached APS's Information Security Policy or The Ohio Privacy Act by disseminating Mr. Johnson's PII to unauthorized persons.

Mr. Johnson first learned of this unauthorized disclosure from an employee with the District who wishes to remain anonymous. According to Mr. Johnson, his anonymous source identified William White as the person who gave Mr. Johnson's PII to members of APS Custodial Department and other APS personnel.

Mr. Johnson alleges that his PII was disclosed to:

- Debra Foulk: Executive Director, Business Affairs;
- Omar Jamirez: SEIU representative;
- Matt Frame: Former Supervisor Custodial Services;
- All APS Head Custodians: including
    - Adam White[2],
    - Brett Dale, and
    - William Sheppard.
- Writers employed by the Akron press.

Mr. William White admits to sharing certain information, about Mr. Johnson, with certain members of the APS Custodial Department. Mr. White[3] denies, however, that he shared Mr. Johnson's PII with anyone who did not already have access to Mr. Johnson's PII. Mr. White avers that any information that he shared about Mr. Johnson was to individuals who were on Mr. Johnson's job interview panel or who had access to the very same information via personnel records or  public record.

---

[2] Adam White is William White's brother.

[3] For the purpose of this report "Mr. White" refers to William White, only.. All references to Adam White are written as "Mr. Adam White."

6

- ○ <u>Ohio Revised Code Chapter 1347(H)</u>:

  (1) No person shall knowingly access confidential personal information in violation of a rule of a state agency described in division (B) of this section.

  (2) No person shall knowingly use or disclose confidential personal information in a manner prohibited by law.

  ...

  (4) A violation of division (H)(1) or (2) of this section is a violation of a state statute for purposes of division (A) of section 124.341 of the Revised Code.

- **Hostile Work Environment**

  - ○ <u>Akron Public Schools, Policy Manual 4362 Anti-Harassment</u>
    Race/Color Harassment - Prohibited racial harassment occurs when unwelcome physical, verbal, or nonverbal conduct is based upon an individual's race or color and when the conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working, and/or learning environment; or of interfering with one's ability to participate in or benefit from a class or an educational program or activity. Such harassment may occur where conduct is directed at the characteristics of a person's race or color, such as racial slurs, nicknames implying stereotypes, epithets, and/or negative references relative to racial customs.

- **Retaliation**

  - ○ <u>Akron Public Schools, Policy Manual 4362 Anti-Harassment</u>
    Other Violations of the Anti-Harassment Policy

    The Board will also take immediate steps to impose disciplinary action on individuals engaging in any of the following prohibited acts:

    A. Retaliating against a person who has made a report or filed a complaint alleging harassment, or who has participated as a witness in a harassment investigation.
    B. Filing a malicious or knowingly false report or complaint of harassment.
    C. Disregarding, failing to investigate adequately, or delaying investigation of allegations of harassment, when responsibility for reporting and/or investigating harassment charges comprises part of one's supervisory duties.

8

For example, William White admits he gave Debra Foulk, Executive Director of Business Affairs, information regarding a civil case brought against Mr. Johnson in 2023, which alleged among other things, sexual harassment and hostile work environment. Mr. White states that he accessed this information via a google search. Debra Foulk in turn confirmed, in an email to Steve Keenan,[4] that William White gave her information about Mr. Johnson's civil case. However, Mr. White denies that he shared Mr. Johnson's PII with anyone.

Mr. White further admits to creating then giving Ms. Foulk a physical file that included:
- Mr. Johnson's job application which contained information that Mike and Yamini were Mr. Johnson's professional references;
- Mr. Johnson's dates of employment with the City of Akron;
- A copy of the Complaint in a 2023 civil matter filed against Mr. Johnson;
- Mr. Johnson's LinkedIn profile;
- A press release from the city of Akron regarding Mr. Johnson.

According to Mr. White, Mr. Matt Frame, his former supervisor, ordered him to initiate a search into Mr. Johnson's background when Mr. Johnson was promoted to Supervisor Custodial Services in August 2024.[5] According to Mr. White he shared the information with Ms. Foulk "so that the District would not be blindsided" should the Akron Press learn about Mr. Johnson's 2023 Court Case, independently.

When asked why Mr. Frame ordered him to conduct a search into Mr. Johnson's background, Mr. White disclosed that Mr. Frame was "not happy" that Mr. Johnson was hired as a Supervisor of Custodial Services. And, according to Mr. White he believes that sharing this information with Ms. Faulk is his primary job responsibility.[6] This is not his primary job responsibility.

Mr. White denies any wrongdoing. He admits that shared Mr. Johnson's PII with Debra Foulk and Matt Frame but correctly avers that Debra Foulk and Matt Frame had their own access to Mr. Johnson's employment application and Mr. Johnson's personnel records which both contained Mr. Johnson's PII.

---

[4] Ms. Foulk was not interviewed in the course of this investigation. However, Mr. Keenan's attestation is supported by William White himself. Mr. White admits that he shared the subject information with Ms. Foulk. For these reasons, the Investigator accepts these statements as true.

[5] Curiously, Mr. White claims that when he found the 2023 civil court matter against Mr. Johnson, Mr. Frame was not available to receive the information. Because Mr. Frame was not available and Mr. Keenan was also not available; Mr. White states that he felt compelled to share the results of his search with Ms. Foulk. Mr. White's reporting structure included Mr. Matt Frame as supervisor; then Mr. Keenan as Mr. Frame's supervisor. However, Mr. White claims that Mr. Keenan was out of the office and did not have internet access. Thus, the next person in his reporting structure was Ms. Foulk. The Investigator finds Mr. White's explanation of his actions is not credible. Mr. White could have waited for Mr. Frame or Mr. Keenan to return to the office since the 2023 civil matter against Mr. Johnson did not present an emergency that needed to be shared with anyone immediately.

[6] "The biggest part of my job was making sure other people can do their job and there were so many complaints about [Mr. Johnson] that [Debra Foulk] should know." *William White Interview, April 15, 2025.*

9

Mr. White also admits that he emailed Reporter Jennifer Pignolet thanking her for reporting on education news, generally. In his email, he also corrected the date and time that Akron Beacon Journal reported for the Board's walkthrough at North High School. He denies that his communication with Ms. Pignolet included any mention of Mr. Johnson.

Within the APS community, other than from Mr. Johnson himself, the only other source of Mr. Johnson PII information was Mr. Johnson's employment application. In August 2024, Mr. Steven Keenan learned Mr. Adam White, Mr. Brett Dale, Mr. William Sheppard, Mr. Matt Buser, Mr. Jason Dickerson, and other APS Head Custodians, knew Mr. Johnson's work history and qualifications at the level of detail they should not know. Mr. Keenan concluded that they knew this information because they had access to Mr. Johnson's employment application.[7] To address this apparent breach of secured information, Mr. Keenan held a series of non-disciplinary meetings with these individuals and their union representatives.

The evidence supports that Mr. Johnson's PII was distributed to all APS Head Custodians as well as to other APS employees. Evidence supports, for example, Mr. Adam White, Mr. Brett Dale, Mr. William Sheppard, Mr. Matt Buser, and Mr. Jason Dickerson knew Mr. Johnson's work history and qualifications at a level of detail they would not know otherwise. However, the evidence does not clearly support that Mr. White provided Mr. Johnson's PII to these individuals.[8]

Several individuals who are alleged to have expressed dissatisfaction with Mr. Johnson's and engaged in the "rumor mill "about Mr. Johnson. However, there is no evidence that they distributed Mr. Johnson's PII.

Several witnesses stated that Matt Frame wanted to select his own successor as Facilities Supervisor and opposed Mr. Johnson's promotion because he felt that Mr. Johnson was too young and inexperienced for the role. "Matt Frame is trying to get everyone to bring information about DJ . . . Matt Frame sent DJ's SSN, home address, and personal information . . . Matt Frame was pissed off for not being able to pick his own folks in the role that DJ now occupies . . . . Matt Frame took me to the side to ask me what I know about DJ . . . ."

In an email from Rob Fincher to William White dated August 24, 2024 at 11:00AM, William White, there is evidence that William White sought to impugn Mr. Johnson: "Will White, I was

---

[7] "I was responding to allegations of it. I never saw anything definitive . . . I didn't see the application in anyone's hands. However, individuals were saying things to me that they could have only gotten from his application." *Steven Keenan Interview, Apr 17, 2025 .*

[8] Moreover, the evidence does not support a conclusion that any current APS employee was the ultimate source of Mr. Johnson's PII. No former APS employees were interviewed.

informed that you wanted statements if we had any negative interactions with DJ. Here is mine."[9] This email did not include Mr. Johnson's PII.

Also, a witness states that Matt Buser, Head Custodian (Custodian Class II) at Seiberling CLC sought information to impugn Mr. Johnson: "We got a text message from Matt Buser saying that if anyone has information about DJ they should come forward."[10]

Additionally, Brett Dale admits that he applied for Mr. Johnson's current role and when Mr. Johnson was promoted, he felt that he was "a better pick" for the role. "Prior to talking with William White and Steve Keenan [about Darian Johnson] I talked with everyone and anyone that I came across [about Darian Johnson]. That's just the kind of person I am. I also talked about the [2023 civil] case in Columbus against DJ for stalking."[11] These statements do not constitute disclosure of Mr. Johnson's PII.

Other witnesses made statements that suggest a pattern of dissatisfaction among some staff regarding Mr. Johnson's promotion. This dissatisfaction led to rumors being spread such as "before [Mr. Johnson] was hired, they changed the application rules [to favor Mr. Johnson]." And Mr. Johnson's PII being disseminated as evidenced by a credible anonymous witness who stated: The "guys did not like the hire . . . they were showing me [Darian Johnson's] personal information."[12] These statements do not constitute disclosure of Mr. Johnson's PII.

While, the evidence supports that Mr. Johnson's PII was distributed to all APS Head Custodians as well as to other APS employees, the investigation did not discover conclusive evidence that Mr. William White distributed Mr. Johnson's PII to unauthorized employees or third parties or that Mr. White violated the Staff Technology Acceptable Use and Safety form (Form 7540.04 F1) or the Ohio Privacy Act.

### B. Roland Mclane's Allegation that William White Breached APS's Information Security Policy and the Privacy Act

Roland McClane alleges that Mr. William White disseminated his social security number, date of birth, home address,  and other personal information ("PII") to unauthorized persons. If true, such actions would amount to a breach of APS's Information Security Policy and the Ohio Privacy Act.  The evidence does not conclusively support the allegation that William White breached APS's Information Security Policy or The Ohio Privacy Act by disseminating Mr. Mclane's PII to unauthorized persons.

---

[9] Email from Rob Fincher to William White dated August 24, 2024: 11:00AM.
[10] Anonymous Witness.
[11] Several witnesses, including Mr. Johnson, Mr. Keenan, and Mr. Dale, state that since August, however, Brett Dale has become a vocal advocate and supporter of Mr. Johnson. The evidence supports that Mr. Dale's view of Mr. Johnson has improved significantly since August 2024 and that the two now maintain a positive professional rapport.
[12] Anonymous Witness.

Mr. Mclane began his role as Temporary Grounds Helpers in March 2025. Mr. Mclane learned, from an individual named "Michael," that Mr. White allegedly shared his PII. Mr. Mclane does not know Michael's last name, what department, or what school he works in. They met while out fishing one day. According to Mr. Mclane, he and "Michael" began talking about work and "Michael" told Mr. Mclane that "Mr. White and them were upset that [Mr. Mclane] got hired over the guy that William White wanted in there and that they didn't to hire him and hired me instead." Mr. Mclane has not seen "Michael" since.[13]

Mr. Mclane states that he suspects his job application was disseminated to unauthorized personnel because rank-and-file coworkers knew the names of Mr. Mclane's relative who had been listed as a reference on Mr. Mclane's job application. Mr. Mclane avers that he did not share the name of his relative with anyone in the school district.

With what he learned from "Michael," and what he heard others saying about his relative-reference, Mr. Mclane reported the potential breach to Mr. Darian Johnson.  While Mr. Johnson is not Mr. Mclane's immediate supervisor, Mr. Mclane states that he reported the incident to Mr. Johnson because he learned of the incident on a day when he was to report to training and he had not yet met his immediate supervisor.

Mr. Mclane attests that because of the disclosure of his PII and the identity of his relative-reference, his first week at work "wasn't a warm welcome." He avers that  some of his new coworkers "turned their heads the other way or walked out of the room" when he entered a room and greeted them. "I am the only black person who works there and everyone else is white so it made me feel like . . .  they didn't even want me there."

William White denies disseminating Roland McClane PII with unauthorized persons. Mr. White admits that he talked with the office custodial office secretary, Patricia Fisher, about Mr. Mclane's application because Mr. McClane had  "fantastic references." He avers that he did show Ms. Fisher the job application but told her he was impressed with Mr. Mclane references. Mr. White told Ms. Fisher that one of Mr. Mclane's previous employers shared a touching  story in which Mr. McClane climbed into a dumpster to help a homeless person. Mr. White states that it was a practice in their office to talk about applicants openly Ms. Fisher.

On March 4, 2025, Angela Carter sent Mr. White an email message reminding him that application and reference survey results are confidential and should not be shared. Mr. White attests that since receiving this informal reminder email from Ms. Carter, he has not discussed Mr. Mclane's qualifications or references with anyone.

Because the Investigator was not able to identify or interview "Michael" and Mr. White avers that he only discussed Mr. Mclane's application with Ms. Fisher, the investigation did not

---

[13] "I haven't seen Michael since that day. This may be because when I'm on morning shift and he's on night shift. While we were fishing I told him my hours and he told me his hours." Roland Mclane Interview, April 16, 2025.

12

discover conclusive evidence that Mr. White distributed Mr. Mclane's PII to unauthorized employees or third parties.

### C. Hostile Work Environment: Darian Johnson

Mr. Johnson attests to a number of personal attacks on his reputation and his work. Mr. Johnson believes that his PII was shared because Mr. Matt Frame and Mr. William White were trying to disgrace him because of his race. Mr. Johnson attests that Mr. Matt Frame told him that "his kind" wasn't wanted in the role. Mr. Johnson also believes he is being targeted because Mr. Matt Frame and Mr. William White were upset that Mr. Johnson was promoted directly from a temporary role to a Supervisory Role which, by all accounts, is a rare elevation in the Facilities Department.

Mr. Johnson believes that based on the campaign against him, initiated by Mr. Matt Frame and Mr. William White, there are APS Principals who view him with an adversarial posture and have branded him as an "angry black man." He believes this will harm his career advancement potential within the APS. As a result of these actions, Mr. Johnson affirms that he experienced mental distress, reputational harm, and loss of sleep. Mr. Johnson alleges that these actions result in a hostile work environment.

Conversely, employees allege that Mr. Johnson has created a hostile work environment by "fixating" on specific employees and "throwing his weight around." Evidence also suggests that Mr. Johnson has been the subject of a number of grievances filed by employees who were unhappy with his promotion and are using the labor relations grievance process as a means to overwhelm Mr. Johnson and undermine his authority.

### 1. Unwarranted and Widespread Personal Attacks on Mr. Johnson's Reputation and Qualifications Were Not Reported by William White.

When Mr. Johnson was promoted, he was hired as the Facilities Supervisor, day shift role. Mr. White, who occupied the day shift Supervisor role, when Matt Frame resigned, was moved to night shift. Mr. White preferred his role as day shift Facilities Supervisor because, in the day shift role, he was able to spend more time with his wife and children. Mr. Johnson attests that when he was promoted, Mr. William White went to Mr. Johnson's office and started shouting at him:

> "This is B\*\*S\*\*! They shouldn't have done this! You're going to regret this! They're going to regret this! No one is going to respect this decision! You're not qualified for this position!"

It is undisputed that since Mr. Johnson's promotion, he has endured a number of challenges to his authority as Facilities Supervisor, from personnel he was tasked with leading. Mr. Johnson believes that Mr. William White and his brother Mr. Adam White are using the grievance process as a means to be vengeful against him personally rather than as a legitimate process for workplace disputes between Mr. Johnson as a supervisor and his Union member direct-reports. Mr. Johnson believes that most of the grievances filed against him were filed because William White told employees to file unsubstantiated grievances.

According to Mr. White, Mr. Johnson was not qualified for the Facility Supervisor position because he applied for the Supervisor position while occupying the role of a Temporary Grounds Helper.[14] Mr. White further opined that, as a temporary worker, Mr. Johnson was "bounced from shop to shop" in the Facilities Maintenance Department.[15] Mr. White went on to state that at weekly joint Maintenance and Custodial Supervisor meetings, Mr. Johnson's name would "come up as a problem."[16]

Mr. White contends that Mr. Johnson needed someone to spell check his application.[17] He also contends that the Facilities Supervisor job description was posted and removed from the APS jobs website multiple times in order to make the application more aligned with Mr. Johnson's qualifications.[18] Mr. White states veteran APS Custodial Staff all have a Boiler's License and when the role was reposted the boiler's license requirement was not included.[19] Mr. White further avers that the Facilities Supervisor job description was originally posted for the role of Facilities Supervisor as a night duty role, but when the job description was reposted it was posted as a daytime role.[20] Mr. White believes that these changes were for the sole purpose of adjusting the role to suit Mr. Johnson.[21]

---

[14] *William White Interview, April 15, 2025.*

[15] *William White Interview, April 15, 2025.*

[16] "I first heard about him because maintenance employees would call me to let me know that he's moving job to job to job and they wanted to get rid of him. And I told them that as a temporary worker they just needed to document and send it over to Keenan. They responded that nothing happened when they did that. He wasn't fired, which I thought was strange since he was a temporary worker. A temp worker is not working out at one building they move them to a different building until they get so many complaints that they stop pitting him on the schedule which is how it is in Custodial but that wasn't how it went down in Maintenance." *William White Interview, April 15, 2025.* "

[17] *William White Interview, April 15, 2025.*

[18] *William White Interview, April 15, 2025.*

[19] *William White Interview, April 15, 2025.*

[20] *William White Interview, April 15, 2025.*

[21] *William White Interview, April 15, 2025.*

14

Steven Keenan Director of Facilities Keenan denies the characterization of Mr. Johnson as a problematic temporary worker.[22]  To the contrary, Mr. Keenan attests that prior to his promotion to Facilities Supervisor, every Department Head who worked with Mr. Johnson gave his work exemplary reviews. Contrary to Mr. White's characterization that Mr. Johnson was "bounced from shop to shop," Mr. Keenan explains that Mr. Johnson expressed interest in working with various Crews and was moved accordingly, based on Mr. Johnson's extensive professional experience performing various job duties.

Mr. Johnson started his temporary assignment at APS in the Grounds Department. When the Grounds Department's work began to slow down, Mr. Keenan reassigned Mr. Johnson to the Paint Crew because the Paint Crew needed the extra help completing the exterior paint on the bus garage. Mr. Johnson had prior experience working on a professional paint crew. The exterior paint on the bus garage project duration was five to six weeks. When that project was nearing completion, Mr. Johnson expressed interest in joining the Audio Visual Department.

Mr. Keenan attests that Mr. Johnson was not the subject of any complaints from the Grounds Crew or Audio Visual Crew, until after Mr. Johnson was promoted. Mr. Keenan admits, however, that while Mr. Johnson was working on the Paint Crew, a non-supervisory senior employee on the Paint Crew complained that Mr. Johnson was occasionally observed looking at or talking on his mobile phone during work hours and that Mr. Johnson was, at times, not "where he needs to be." Mr. Keenan understood those complaints to be minor and responded by counseling the complaining employee to raise his concerns to Mr. Johnson, directly.

According to Mr. Keenan, Mr. Johnson's reassignments during Summer 2024 "had nothing to do with" complaints regarding Mr. Johnson's work performance. To the contrary, Mr. Johnson's work performance reviews were stellar. Thus, when Mr. Johnson applied for the Facilities Supervisor position, his performance across departments was considered exemplary. It was only after his promotion that Mr. Johnson's performance was, retrospectively, considered to be problematic. Ironically, after Mr. Johnson's promotion, the very same supervisors who had formerly rated him highly, started rumors that he was a poor employee, once he became their supervisor.[23]

Despite William White's belief that he is more qualified than Darian Johnson for the role of Facilities Supervisor, day shift, there is evidence that William White is a poor manager whose

---

[22] "I was blown away by the level of unprofessionalism and the demonizing of DJ based on his qualifications. That is not the job of a peer or a subordinate. It's outrageous to think they have that right or ability." *Steven Keenan Interview April 17, 2025*

[23] Beyond that it was a very personal attack for no reason. For instance Jason Dickerson is the foreman of the audio visual department and [Mr. Johnson] had been working with him and I had stationed him with the AV department and Jason had been giving [Mr. Johnson] glowing reviews earlier that day then later that [same] day, when he realized [Mr. Johnson] was going to become his boss it was a 180 [degree] change and then it became [Mr Johnson] is the worst worker with no veritable evidence of why the change . . . I wonder if it's because he's young and Black and from the outside . . ."

professionalism "could be improved" because "he comes off as immature especially via email." Witnesses state that Mr. White communicates issues that are immature or poorly articulated. And that Mr. White often proposes solutions to problems that he's not involved in, with opinions and solutions that are inappropriate for the problem presented.

Further, witnesses substantiate that when William White was on day shift, he was "chaotic." While many witnesses characterize Mr. White as " a good dude overall," multiple witnesses state that he lacks leadership abilities and historically followed the lead of Matt Frame, without critical thinking. Witnesses state that William White "did everything that Matt [Frame] told him to do." Witnesses attest that Matt Frame and William White had a close working relationship and acted with one mind, "so whatever one said the other would be saying the same thing." Thus, according to witnesses, when Matt Frame expressed his opposition to Mr. Johnson's promotion stating that Mr. Johnson was "too young" to be in the role, William White would also state the same opinion. Namely that Mr. Johnson was "too young." A puzzling conclusion since Mr. White and Mr. Johnson are very close in age, if not peers.

The evidence substantiates that personnel Mr. Johnson is tasked with leading, are being coached to provoke Mr. Johnson and then record or report his reactions.[24]

Not only did Matt Frame and William engage in behavior that disregarded Mr. Johnson as their peer, they failed to investigate adequately, and delayed investigation of allegations of harassment against Mr. Johnson. Thus, there is substantial evidence that William White, among others, engaged in behavior that created a hostile work environment for Darian Johnson by failing to investigate and report unwarranted and widespread insubordination and personal attacks on Mr. Johnson's qualifications and reputation.

2. Unwarranted and Widespread Insubordination at Buchtel High School

During the summer, APS High Schools undergo an extensive deep cleaning to prepare for the return of students and staff to the building. By August, deep-cleaning is expected to be 95% or more completed.

---

[24] "Employees are being coached to say certain things to provoke him and then record it. I know this because I got emails letting me know that Matt Frame said if you're around DJ do this or record. . . Everyone was [very upset] about the hiring so they were showing me and everyone else." Anonymous Witness

16

By mid-August, Buchtel H.S. was only 50% cleaned. When Mr. Johnson was promoted to Facilities Supervisor, he had just a few weeks to bring the building to standards acceptable for the imminent return of students and teachers to the building.[25]

During that time, multiple custodians accused Mr. Johnson engaging in harmful actions toward them, including:

- Inappropriately discarding old unused American flags against protocol for flag disposal: which was taken as disrespectful to veterans;
- Telling a custodian with that due to the employee's disability, an eye injury, he would no longer be assigned to clean the administrative office at the building: which was taken as belittling;
- Telling the Buchtel staff that he would always be there, at Buchtel, until the building was properly cleaned: which was taken as harassing and bullying;
- Pressing the Head Custodian, Alex Ristich to do his job and moving to Mr. Ritsch tears; which was considered too harsh and vengeful.

Before Darian Johnson was promoted to Facilities Supervisor, William White occupied the day shift Facilities Supervisor position. There is no evidence that grievances were filed against Mr. White by Buchtel staff. However, when Mr. Johnson took the role, multiple grievances were filed against him.

Alex Ritsch had occupied the Head Custodian position at Buchtel for 16 years. Multiple witnesses describe Mr. Ritsch as "not a good worker," "not a very strong head custodian," lacking "the attitude or manner to run a High School Custodial Staff," and as having "poor time management." Moreover, by many accounts, Mr. Ritsh generally takes a combative attitude when asked to perform his work duties and generally becomes combative "about getting things done."

In August 2024, when Mr. Johnson inherited Mr. Ritsch as an employee, Mr. Ritsch's work-product demonstrated a clear failure to meet the responsibilities of his role. The state of the Buchtel High School building was seriously deficient. Witnesses state that Mr. Johnson "had every right to go over there to babysit." While admitting that under Mr. Johnson's leadership, the Buchtel building has been in acceptable condition,certain witnesses attest that Mr. Johnson "took it way too far."

---

[25] Buchtel, towards the end of summer, it should have been spotless . . . The summer primary goal is a deep cleaning so that they return to a very clean building. By the condition of the school by the end of the summer it was 50% complete and the beginning of August should have been 90% complete. So there was a redirection of supplies and personnel to get it to where it should be. Alex was formally disciplined through human capital for the work that he did not complete. He was suspended without pay for three days for not doing his job. *Steven Keenan Interview April 17, 2025.*

17

Witnesses further state that, in performing his duties, Mr. Johnson should not have:

- Moved Thomas ("Tom") Frederick, Custodian Class III (Head Custodian) to second shift;
- Mandated that the custodial staff do "bizarre stuff" like clean the glass doors every 15 mins on the evening that the Superintendent had the State of System address;"It was like treating the Superintendent visit as if the King was coming."
- Given a Head Custodian a negative evaluation because they refused to perform their job duty of salting the sidewalks;
- Been dismissive of a complaint by a High School principal who "didn't like a pull worker."

Mr. Johnson is consistently reported to have a problem with "all the custodians" because Mr. Johnson "comes in hot and demands" that people "bow down to him" and that he "likes to throw his power around." However, upon close review of these purported examples of Mr. Johnson taking his duties "too far," it becomes clear that Mr. Johnson is executing his duties as a manager and specifically as Facilities Supervisor. In executing his duties he is being met with wide resistance. The evidence supports that this resistance is simply because members of the facilities team are not accustomed to doing their job or taking direction from "someone like" Mr. Johnson.[26]

First, witnesses state that Mr. Johnson does not get along with Mr. Frederick because Mr. Fredericks calls Mr. Johnson out on everything. It is unremarkable that a supervisor and colleagues reporting to him in the organizational structure do not get along when the supervisor's authority is consistently undermined. Next, during the Superintendent's visit to a high school, it is unremarkable that Mr. Johnson sought to maintain a spotless environment. Lastly, it is also unremarkable that a Head Custodian would be given a negative review when they refuse to perform an essential safety function of their role, namely, salting the sidewalks during winter weather.

---

[26] Mr. Johnson is new to APS and thus considered an "outsider." Further his age and race may present an unfamiliar challenge to those unaccustomed to him in the role of Supervisor when historically, employees in the Facilities Department  are accustomed to reporting to Matt Frame and those in his age and race demographic.

"I cannot say a hostile work environment because that can be subjective and because it's a young black man talking to an older white guy. Early on, it was him being fixated on the problem not the person. For instance the lack of cleanliness and the painting at Buchtel CLC. He was fixated on getting the work done and that required him consistently approaching Ritsch at that building, as the lead person in the building. So being fixated on the problem came off as fixated on the person. From my view it was fixated on the work that needed to be done." *Steven Keenan Interview April 17, 2025.*

I think that he may have kind of talked a little out of place to an employee and I would correct him as a Union Steward. Everyone is pissed off at him and he had an adjustment period. But he never disrespected an employee. *Steven Keenan Interview April 17, 2025.*

### 3. The Lack of Redress Regarding Employee Concerns: The Confederate Painting

In mid-August 2024, William Sheppard was assigned to walk the property at Buchtel and Lichtel with Steve Johnson, who had been recently promoted to Building Supervisor at Buchtel. Mr. Johnson was new in his role as Facilities Supervisor so he asked Mr. Sheppard to shadow Steve Johnson at Buchtel. The daytime Custodial Supervisor at Buchtel accompanied the two men during their walk through.  When the group entered a locked room that was ostensibly the office of the Head Custodian, Alex Ristich, they encountered an office described by all parties and witnesses as "filthy." Hanging in plain view was a wall-sized painting depicting a confederate flag with the likeness of a large white male figure's face looking down on a group of Black people, depicted in miniature, standing under the male figure's face.

Johnson and Sheppard each separately reported the conditions of the office and the painting to Darian Johnson, Matt Frame, and William White. According to Mr. Sheppard, Matt Frame and William White expressed no concerns regarding the deplorable state of the office or the painting within it. He states that their only concern was why Sheppard was at the Buchtel building and accused him of "stealing time" from APS by being in a building to which he was not assigned.  As Director, Steve Keenan also received photos of the room and the painting. He attests that since art is subjective to him, the painting depicted the Underground Railroad. What concerned Keenan most was the unhygienic state of the room and that such a painting was inappropriately being prominently displayed in a building that educated mostly students of color.  Moreover the office that contained the controversial painting was being utilized as a temporary dwelling.

Rather than simply address the sensitive nature of the painting with the Black employees to understand any concerns that may have been raised by the presence and display of the painting, the painting was stored away and never again discussed.

### D. Hostile Work Environment: Roland McLane

In April 2025, Roland McClane discovered that his car was scratched. He states that one day, he went to work then went directly home. The next day, when leaving work, he noticed that his car displayed a scratch that went from his front passenger door and to his back passenger door. He recalled that an APS maintenance vehicle was parked close to him. He admits that his door could have hit the other car door. However he doesn't know who operates the APS maintenance vehicle. He avers that the only places he takes his care are out fishing and to and from his home. He avers that there is no one who would have scratched his car at home.

Surveillance footage of the area does not depict anyone in the parking area, near Mr. Mclane's vehicle. With no evidence to support an allegation that the damage to Mr. Mclane's vehicle was intentional or even that it occurred while it was stationed on APS property, there is no evidence that Mr. Mclane has been subject to a hostile work environment.

### E.  Darian Johnson's Allegation that Adam William Engaged in Retaliation

Mr. Johnson alleges that on April 15, 2025, Adam White made retaliatory comments regarding the complaint Mr. Johnson filed that led to the investigation of William White, Adam White's younger brother. Mr. Johnson asserts that Adam White expressed frustration about the investigation and threatened to use the grievance process against him unless the complaint was withdrawn.

While the allegation is serious, the available evidence does not support a clear finding of retaliation as defined under Board policy or applicable law. First, the content and timing of the conversations between Mr. Johnson and Adam White are disputed. Adam White contends that no conversation occurred on Tuesday, April 15, and denies speaking with Mr. Johnson on that date. He later concedes that a conversation did occur but characterizes it as brief and focused primarily on labor-management issues, specifically the handling of the shift change for an Itinerant Head Custodian.

Second, contemporaneous emails, text messages, and statements from both parties show that a significant point of contention was Mr. Johnson's handling of a shift change rather than the William White investigation. Multiple statements and interviews indicate that Adam White expressed his intent to file grievances related to the Itinerant Supervisor matter, a labor issue independent of the ongoing investigation into his brother. Moreover, follow-up communications between Mr. Johnson and Adam White do not contain objectively retaliatory content. When asked to produce supporting documentation, Mr. Johnson provided emails that were routine in tone and did not contain any language that reasonably supports a retaliation claim.

Finally, there is insufficient corroborating evidence from witnesses or phone records to establish that Mr. White's alleged comments constituted retaliation or were directly connected to the protected activity of filing a complaint. While the conversation may have been inappropriate or tense, it falls short of demonstrating a retaliatory motive.

Based on the evidence, the present investigation did not reveal evidence that Adam White engaged in retaliation against Darian Johnson. The grievance discussions appear to be related to a separate labor issue, and there is no reliable evidence that Mr. White conditioned his response or conduct on the withdrawal of the complaint against his brother.

## VII.  Conclusion

Based on the totality of the evidence gathered during the course of this investigation, including witness interviews, documentation, and relevant policies, the undersigned investigator makes the following determinations:

20

- **Did William White breach APS's Information Security Policy and the Privacy Act with respect to Darian Johnson?** Inconclusive. This investigation did not yield sufficient evidence to determine whether a violation of APS's Information Security Policy or the Privacy Act occurred in connection with Mr. Johnson.
- **Did William White breach APS's Information Security Policy and the Privacy Act with respect to Roland McClane?** Inconclusive. The available evidence was similarly insufficient to establish that William White violated applicable policies or privacy protections concerning Mr. McClane.
- **Did any APS employee subject Darian Johnson to a hostile work environment?** Yes. The evidence supports a finding that Mr. Johnson experienced unwelcome conduct that created a hostile work environment in violation of APS policy.
- **Did any APS employee subject Roland McClane to a hostile work environment?** No. While certain concerns were raised, the conduct described did not meet the threshold for a hostile work environment under APS policy, or the evidence was insufficient to make a definitive finding.
- **Did Adam White retaliate against Darian Johnson?** No. The investigation did not substantiate Mr. Johnson's claim of retaliation. The evidence does not support a conclusion that Mr. White engaged in conduct prohibited by APS's anti-retaliation policies.

## VIII.   Recommendations

Based on the totality of the evidence and themes raised during this investigation, the following recommendations are provided to address both individual conduct and broader systemic and cultural issues within the Facilities Department:

### 1.  Workplace Conduct and Retaliation Training

It is recommended that all supervisory personnel and union representatives participate in a facilitated training focused on workplace conduct, professional boundaries, and retaliation prevention. The purpose of the training is to clarify the line between advocacy, interpersonal conflict, and retaliatory behavior, and to support a shared understanding of expectations for workplace professionalism.

### 2.  Workplace Culture and Team Norms Training

Given the consistent themes that emerged during the investigation regarding workplace culture, including concerns related to race, age, and interpersonal dynamics within the department, it is recommended that the District implement a department-wide training or facilitated dialogue series focused on professional norms, effective communication, and inclusive team culture. Structured engagement in these areas may help the department develop shared expectations for collaboration, improve

21

conflict resolution, and support a more equitable and respectful culture across all levels of staff.

### 3. Confidential and Anonymous Reporting Mechanisms

In light of expressed fears of retaliation, it is recommended that the District develop or strengthen mechanisms for confidential feedback and reporting. This may include the use of anonymous surveys, a third-party hotline, or ombuds services to allow employees to raise concerns about retaliation, discrimination, or workplace climate without fear of adverse consequences.

### 4. Refresher on Information Security and Confidentiality Policies

It is recommended that APS provide a refresher for all relevant personnel on policies governing information security, confidentiality, and appropriate use of personnel data. Particular attention should be given to reinforcing boundaries around access to and use of disciplinary records and internal personnel communications.

### 5. Transparent Selection Processes for Supervisory Positions

To address concerns regarding fairness and perceptions of favoritism in shift assignments and internal promotions, it is recommended that the District implement a transparent and consistently applied selection process for supervisory roles. Documentation of scoring criteria, interview processes, and rationale for hiring decisions should be made available to the extent permissible under policy and law.

### 6. Restorative and Preventative Interventions

In light of ongoing interpersonal conflict and diminished trust among team members, it is recommended that the District consider the use of restorative interventions, such as facilitated dialogue or conflict resolution coaching. These interventions may assist in de-escalating conflict and rebuilding collegial working relationships. Consideration should also be given to leadership coaching and other preventative supports aimed at improving team dynamics and communication.

### 7. Post-Investigation Monitoring and Retaliation Safeguards

Given the credible concerns expressed by multiple witnesses regarding possible retaliation, it is recommended that the District anonymize witness identities in this report where feasible and monitor for any adverse employment actions involving investigation participants. Human Resources should review any such actions to ensure compliance with anti-retaliation policies and applicable law.